## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

DONNA M. SHAW,            )
                                 )
      Plaintiff,         )
                                 )
    vs.                 )       **Case No. 4:10CV 1127 LMB**
                                 )
MICHAEL J. ASTRUE,      )
Commissioner of Social Security,   )
                                 )
      Defendant.     )

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Donna M. Shaw for Supplemental Security Income under Title XVI of the Social Security Act. This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties. See 28 U.S.C. § 636(c). Plaintiff has filed a Brief in Support of the Complaint. (Document Number 14). Defendant has filed a Brief in Support of the Answer. (Doc. No. 17). Plaintiff has also filed a Reply. (Doc. No. 20).

## Procedural History

On October 19, 2007, plaintiff filed her application for benefits, claiming that she became unable to work due to her disabling condition on August 1, 2004. (Tr. 264-66). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated September 24, 2009. (Tr. 129-33, 100-07). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the

Social Security Administration (SSA), which was denied on April 28, 2010.  (Tr. 91-93).  Thus, the decision of the ALJ stands as the final decision of the Commissioner.  See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.    ALJ Hearing

Plaintiff's administrative hearing was held on May 27, 2009.  (Tr. 15).  Plaintiff was present and was represented by counsel.  (Id.).  Also present was vocational expert Brenda Young.  (Id.).

The ALJ examined plaintiff, who testified that she lived in a three-level townhouse.  (Tr. 18).  Plaintiff stated that she rarely visits the third floor.  (Id.).  Plaintiff testified that she was forty years of age, was five-feet, two-inches tall, and weighed about 324 pounds.  (Tr. 18-19).  Plaintiff stated that she was separated from her husband and had seven children, whose ages ranged from two to twenty.  (Tr. 19).  Plaintiff testified that all of her children live with her.  (Id.).

Plaintiff stated that she took a cab to the hearing.  (Id.).  Plaintiff testified that she does not have a valid driver's license because she allowed her license to expire.  (Tr. 20).  Plaintiff stated that she last drove eight months prior to the hearing and that she did not own a car.  (Id.).

Plaintiff testified that her daughter receives disability benefits due to a severe learning disability.  (Id.).  Plaintiff stated that her daughter also receives disability benefits on behalf of her father because he is disabled.  (Id.).  Plaintiff testified that she receives child support.  (Id.).  Plaintiff stated that her total income from child support and disability benefits is about $1,300.00 a month.  (Id.).

Plaintiff testified that she received unemployment benefits in 2002 or 2003.  (Tr. 21).

- 2 -

Plaintiff stated that she received benefits for the full six months.  (Id.).

Plaintiff testified that she completed the eleventh grade and then dropped out of school. (Id.).  Plaintiff stated that she stopped going to school because she was having issues at home with her mother.  (Id.).  Plaintiff testified that she tried unsuccessfully to obtain her GED.  (Id.).

Plaintiff stated that she earned a behavioral science certificate in 2002 after completing a "welfare to work" program.  (Id.).  Plaintiff testified that this program provided training in life skills, such as interviewing techniques.  (Tr. 22).  Plaintiff stated that she has not received any other vocational training.  (Id.).

Plaintiff testified that she was able to read and write.  (Id.).

Plaintiff stated that she was not working at the time of the hearing.  (Id.).  Plaintiff testified that she last worked in August of 2006.  (Id.).  The ALJ noted that plaintiff was alleging a disability onset date of August 1, 2004.  (Tr. 23).  Plaintiff testified that nothing specific happened on August 1, 2004, but she was in a lot of pain at that time.  (Id.).

Plaintiff stated that her last position was a job coach for the mentally challenged.  (Tr. 24). Plaintiff testified that this was a summer program with the Juvenile Center for Autism, and that she worked with autistic children.  (Id.).  Plaintiff stated that this position lasted for three months. (Id.).  Plaintiff testified that the heaviest items she lifted at this position were shoe boxes weighing less than ten pounds.  (Id.).  Plaintiff testified that she also worked with people with disabilities at the Association for Retarded Citizens ("ARC") for about one year prior to her position working with autistic children.  (Id.).

Plaintiff stated that she did not work in 2004 or 2005 because she was a stay-at-home-

mom at this time.  (Tr. 25).

Plaintiff testified that she worked for ARC from 2002 to 2003.  (Id.).

Plaintiff stated that in 2001, she worked at Cardinal Glennon Hospital in environmental services, which involved cleaning patient rooms.  (Tr. 26).  Plaintiff testified that this position required a lot of lifting, squatting, and stooping.  (Id.).  Plaintiff stated that she received hazardous materials training for this position.  (Id.).  Plaintiff stated that she typically cleaned about thirty rooms a day.  (Id.).  Plaintiff testified that she only lifted about ten pounds at this position.  (Id.).  Plaintiff stated that she worked at the position for about one year.  (Tr. 27). Plaintiff testified that she was terminated because was frequently late due to problems with transportation.  (Id.).

Plaintiff stated that she worked at Cooperative Home Care, a home health agency, off and on for four to five years.  (Id.).  Plaintiff testified that this position involved taking care of patient's personal needs, including household chores.  (Id.).  Plaintiff stated that this was a heavy-duty job because she was required to lift patients frequently.  (Id.).

Plaintiff testified that she worked as a cashier at a fast food restaurant in 1996.  (Tr. 29). Plaintiff stated that she lifted less than ten pounds at this position, which lasted about eight months.  (Id.).

Plaintiff testified that she worked at Alexian Brothers performing environmental services work, the same type of work she performed at Cardinal Glennon.  (Tr. 30).  Plaintiff stated that she cleaned professional buildings at night at this position.  (Id.).  Plaintiff testified that she lifted about ten pounds at this position.  (Id.).  Plaintiff stated that she worked at the position for about one year.  (Id.).

Plaintiff testified that she applied for a position at Wal-Mart since 2006. (Tr. 31). Plaintiff stated that she thought Wal-Mart typically hired persons with disabilities. (Id.). Plaintiff testified that she hoped to work as a greeter. (Id.).

Plaintiff stated that, on a typical day, she usually arises at 11:00 a.m. (Tr 32). Plaintiff testified that her mornings are hectic because she has three small children. (Id.). Plaintiff stated that she attempts to prepare breakfast for her children. (Id.). Plaintiff stated that her older children perform most of the household chores. (Id.). Plaintiff testified that she does not cook because she is unable to stand long enough to prepare a meal. (Id.). Plaintiff stated that she does very little laundry. (Id.). Plaintiff testified that she occasionally sits in a chair to wash dishes. (Tr. 33). Plaintiff stated that she does not own a dishwasher. (Id.). Plaintiff testified that she is unable to make her bed or change sheets. (Id.). Plaintiff stated that she is unable to vacuum because the back and forth motion hurts her back. (Id.). Plaintiff testified that she is able to mop while sitting in a chair. (Id.). Plaintiff stated that she is able to sweep but is unable to bend down to use the dustpan. (Tr. 34). Plaintiff testified that her children help her sweep. (Id.).

Plaintiff stated that she receives food stamps. (Id.). Plaintiff testified that her oldest daughter does most of the grocery shopping, although she occasionally accompanies her. (Id.). Plaintiff stated that she sits in a motorized cart when she goes to the grocery store. (Id.). Plaintiff testified that she occasionally becomes aggravated at the grocery store due to her physical pain, especially if a motorized cart is not available. (Tr. 34-35).

Plaintiff stated that she does not have much of a social life. (Tr. 35). Plaintiff testified that she has a lot of friends and she stays in contact with them through occasional telephone conversations. (Id.). Plaintiff stated that her friends rarely visit her at her home. (Id.). Plaintiff

testified that she gets along with her children pretty well.  (Id.).  Plaintiff stated that she has not

met any of her neighbors because she is a solitary person.  (Id.).  Plaintiff testified that she is not

involved in any clubs or organizations.  (Id.).  Plaintiff stated that she does not attend church

because she lacks adequate transportation.  (Tr. 36).

Plaintiff testified that she spends her days running after her small children.  (Id.).  Plaintiff

stated that she has been trying to prepare her five-year-old for school by teaching him basic skills.

(Id.).  Plaintiff testified that she reads a little and watches a little television.  (Id.).  Plaintiff stated

that she does not enjoy television much.  (Id.).  Plaintiff testified that she enjoys reading spiritual

books and magazines, including the Bible.  (Id.).  Plaintiff stated that she looks at the sales ads in

the newspaper.  (Tr. 37).  Plaintiff testified that she has two school-aged children, and that she

occasionally helps them with homework.  (Id.).  Plaintiff stated that one of her daughters is an

honor-roll student and does not require much help with homework, but her other daughter is

learning disabled and requires assistance.  (Id.).  Plaintiff testified that her children take turns

cooking supper.  (Tr. 38).  Plaintiff stated that, after supper, her children prepare for school and

clean the house.  (Id.).  Plaintiff testified that she bathes her children, which is a task.  (Id.).

Plaintiff stated that she is not able to take her children anywhere special on the weekends.

(Tr. 39).  Plaintiff testified that she would like to take her children to the park, but she is unable to

walk that far.  (Id.).  Plaintiff stated that the park is four to five blocks from her home.  (Id.).

Plaintiff testified that the children's father never comes over to help with the children.  (Id.).

Plaintiff stated that her only hobby is reading.  (Id.).  Plaintiff testified that she rarely goes

outside.  (Id.).

Plaintiff stated that she is able to take a short shower but she is unable to take a bath.

(Id.).  Plaintiff testified that she cannot sit down in the bath tub.  (Id.).  Plaintiff stated that she has
to sit on the side of the tub to bathe.  (Id.).

Plaintiff testified that she does not smoke, drink, or do illegal drugs.  (Tr. 40).  Plaintiff
stated that she has never had a drinking problem.  (Id.).

Plaintiff testified that she takes a lot of medication.  (Id.).  Plaintiff stated that she takes
aspirin daily for her heart.  (Id.).

Plaintiff testified that she uses a nasal spray for allergies.  (Id.).  Plaintiff stated that she is
allergic to mold, pollen, cigarette smoke, gases, and dust.  (Tr. 41).

Plaintiff testified that she takes Hydrochlorothiazide and Labetalol[1] for her blood pressure.
(Id.).  Plaintiff stated that she has had high blood pressure for seven to eight years.  (Id.).  Plaintiff
testified that her blood pressure is not under control with these medications.  (Id.).  Plaintiff stated
that the dosages were recently increased.  (Id.).

Plaintiff testified that she takes Metformin[2] for diabetes.  (Tr. 42).  Plaintiff stated that she
has been diabetic for three or four years.  (Id.).  Plaintiff testified that her diabetes is controlled
with medication.  (Tr. 43).  Plaintiff stated that she took insulin when she was pregnant.  (Id.).
Plaintiff testified that she has a blood sugar machine at home.  (Id.).  Plaintiff stated that she
checks her blood sugar levels occasionally.  (Id.).  Plaintiff testified that her blood sugar levels
vary, depending on what she eats.  (Id.).

Plaintiff stated that she takes medication for constipation.  (Id.).

---

[1]Hydrochlorothiazide and Labetalol are indicated for the treatment of hypertension.  See
Physician's Desk Reference (PDR), 642 (63rd Ed. 2009).

[2]Metformin is indicated to improve glycemic control in patients with type 2 diabetes.  See
PDR at 3072.

Plaintiff testified that she takes Simvastatin[3] for cholesterol.  (Id.).

Plaintiff stated that she takes Tramadol[4] for arthritic pain.  (Tr. 44).  Plaintiff testified that she experiences pain in her knees, feet, and lower back.  (Id.).  Plaintiff rated her everyday pain as a six or seven on a scale of one to ten.  (Id.).  Plaintiff testified that the Tramadol takes the edge off the pain but does not eliminate it.  (Id.).  Plaintiff stated that she also takes Etodolac[5] for her arthritis.  (Tr. 45).

Plaintiff testified that she experiences side effects from her medications.  (Id.).  Plaintiff stated that her blood pressure medication occasionally causes her to feel disoriented, light-headed, and weak.  (Id.).  Plaintiff testified that she sometimes has to lie down after taking her medication. (Id.).  Plaintiff stated that she has talked to her doctor about these side effects.  (Id.).  Plaintiff testified that she sometimes experiences nausea after taking her pain medication.  (Tr. 46).

Plaintiff stated that she is holding up mentally, although she is irritable some days.  (Tr. 47).  Plaintiff testified that it is sometimes difficult to take care of her children because she is in a lot of pain.  (Id.).  Plaintiff stated that she has never been in a mental hospital or under psychiatric care.  (Id.).  Plaintiff testified that her concentration is really poor because she is concerned with her health.  (Id.).  Plaintiff stated that she took Trazodone[6] at one point.  (Id.).

---

[3]Simvastatin is indicated for the treatment of hypercholesterolemia.  See PDR at 502.

[4]Tramadol is a synthetic opioid analgesic indicated for the management of moderate to moderately severe chronic pain in adults who require around-the-clock treatment of their pain for an extended period of time.  See PDR at 2429.

[5]Etodolac is a nonsteroidal anti-inflammatory drug indicated for the treatment of arthritis. See WebMD, http://www.webmd.com/drugs (last visited September 6, 2011).

[6]Trazodone is an antidepressant indicated for the treatment of depression and other mood disorders.  See WebMD, http://www.webmd.com/drugs (last visited September 6, 2011).

Plaintiff testified that she is not able to sit for long periods. (Id.). Plaintiff stated that, when she is at home, she alternates between sitting, standing, walking, and lying down. (Id.). Plaintiff testified that she is able to stand for ten to fifteen minutes. (Tr. 48). Plaintiff stated that she is able to walk for one to one-and-a-half blocks. (Id.). Plaintiff testified that she occasionally walks farther to the bus stop, but she has to take a lot of breaks. (Id.). Plaintiff stated that she has to walk often because she does not have a car. (Id.). Plaintiff testified that she takes the bus to the grocery store. (Tr. 49).

Plaintiff stated that her knees are in bad condition. (Id.). Plaintiff testified that she has severe arthritis in both of her knees and no cartilage in her right knee. (Id.). The ALJ noted that plaintiff reported to a doctor in May of 2008 that she had no knee pain. (Id.). Plaintiff stated that she did not recall making that statement. (Id.). Plaintiff's attorney pointed out that plaintiff did complain of bilateral knee pain but the doctor found she had nearly full range of motion of both knees without pain. (Tr. 52-53).

The ALJ noted that, in a function report plaintiff completed in October of 2007, plaintiff reported that she cooked, cared for three small children, did laundry, washed dishes, mopped, drove, shopped, and paid bills. (Tr. 50). Plaintiff testified that she occasionally paid the bills, although she often sent her daughter to pay the bills. (Id.). Plaintiff stated that she does not have a checking account, and that she pays her bills with cash. (Id.). The ALJ also noted that plaintiff reported reading, watching movies, and attending church. (Id.).

Plaintiff testified that she is able to lift a gallon of milk but nothing heavier. (Tr. 51). Plaintiff stated that she is only able to do minimal bending. (Id.). Plaintiff testified that she is unable to do a significant amount of bending low. (Id.). Plaintiff stated that she experiences

difficulty climbing steps and that she uses the railing.  (Id.).  Plaintiff testified that she moved into a three-level townhouse because she was homeless at the time and did not have any other options. (Id.).

Plaintiff's attorney then examined plaintiff, who testified that she applied for a part-time job at Wal-Mart before she applied for Social Security benefits in 2007.  (Tr. 53).

Plaintiff stated that she uses a motorized cart at the grocery store.  (Tr. 54).

Plaintiff testified that bathing her kids is a task.  (Id.).  Plaintiff stated that she experiences pain when she bends her knees.  (Id.).  Plaintiff testified that it is difficult to bathe her children because her bathtub is low to the ground.  (Id.).  Plaintiff stated that her older children help her bathe the younger children.  (Id.).

Plaintiff testified that, when she takes a bath, she sits on the side of the tub because she is unable to sit in the tub due to her knee pain and the amount of weight on her knees.  (Id.).

Plaintiff stated that during the hearing, she was using a cane that was prescribed by her doctor.  (Id.).  Plaintiff testified that she has used the cane since 2008, when she started seeing an orthopedist.  (Tr. 55).  Plaintiff stated that she uses the cane when she has to climb up steps, or when she has to do a lot of walking.  (Id.).  Plaintiff testified that she used the cane to walk from the lobby at the hearing into the hearing room, a distance of twenty to thirty feet of level surface. (Id.).  Plaintiff stated that she occasionally uses her cane when she is in an office-type environment.  (Id.).  Plaintiff testified that she also uses the cane for balance.  (Id.).

Plaintiff stated that her feet swell.  (Id.).  Plaintiff testified that her doctor prescribed inserts for her shoes.  (Tr. 56).  Plaintiff stated that she wears slip-on shoes because she is unable to bend down to put on and tie shoes with laces.  (Id.).  Plaintiff testified that she is unable to put

- 10 -

on socks and that one of her children has to help her.  (Id.).

Plaintiff stated that the longest she is able to sit is about thirty minutes.  (Id.).  Plaintiff
testified that she is able to sit this long to fold clothes or eat.  (Id.).

Plaintiff stated that she naps everyday at varying times.  (Id.).  Plaintiff testified that she
lies down in her bed rather than a recliner.  (Tr. 57).  Plaintiff stated that she typically spends three
to four hours a day in bed.  (Id.).  Plaintiff testified that her children frequently come to ask her
questions while she is in bed.  (Id.).

Plaintiff stated that she uses the bathroom constantly during the night due to her diabetes.
(Tr. 58).  Plaintiff testified that her diabetes causes frequent urination, especially when her sugars
are high.  (Id.).  Plaintiff stated that she uses the bathroom frequently during the day as well.
(Id.).  Plaintiff testified that she occasionally experiences difficulty getting to a restroom fast
enough when she is in public.  (Id.).

Plaintiff stated that she recently saw a doctor at Barnes who evaluated her back.  (Id.).
Plaintiff testified that she was experiencing increased back pain that became unbearable.  (Tr. 59).
Plaintiff stated that she requested an MRI but the doctor ordered x-rays.  (Tr. 59).  Plaintiff
testified that the x-rays revealed arthritis.  (Id.).

The ALJ then examined the vocational expert, Brenda Young, who described plaintiff's
past positions as job coach, light and semiskilled; housekeeping, light and unskilled; home health
aide, heavy and semiskilled; and fast food cashier, light and unskilled.  (Tr. 60-61).  The ALJ
asked Ms. Young to assume a hypothetical individual of plaintiff's age, a limited education, and
plaintiff's past relevant work experience with the following limitations: capable of lifting carrying,
pushing, and pulling ten pounds occasionally and frequently; capable of sitting for six out of eight

hours; standing and walking for two out of eight hours for a total of eight out of eight hours;

capable of occasional climbing, stooping, crouching, kneeling and crawling; no exposure to

ladders, ropes, scaffolds or unprotected heights; and no concentrated exposure to dust, fumes,

gases, and chemicals. (Tr. 62). Ms. Young testified that these restrictions would eliminate

plaintiff's past work. (Id.). Ms. Young stated that there would be other jobs such an individual

could perform. (Id.). Ms. Young testified that the individual could perform sedentary jobs such

as a customer service representative (8,000 positions locally); telemarketer (4,500 locally); and

small product assembly (3,000 locally). (Tr. 62-63).

    Plaintiff's attorney then asked Ms. Young whether any sedentary, unskilled positions

would be available to an individual who would need more than three breaks during a typical

workday. (Tr. 63). Ms. Young testified that generally, no more than two breaks and one lunch

period are allowed in an eight-hour day. (Tr. 64). Ms. Young stated that the standard break is

fifteen minutes and the standard lunch period is thirty minutes, although some employers provide

one-hour-long lunch periods. (Id.).

    Ms. Young testified that no unskilled position in the economy would allow for the

individual to lie down during the workday. (Id.).

    Plaintiff's attorney asked Ms. Young whether a functional capacity of sitting for not more

than thirty minutes, standing no more than ten to fifteen minutes, and walking no further than one

to one-and-a-half blocks would be less than sedentary exertion. (Id.). Ms. Young testified that

the sitting limitation of thirty minutes would be less than sedentary exertion. (Id.).

    The ALJ indicated that he would leave the record open for thirty days. (Id.).

**B.    Supplemental Hearing**

A supplemental hearing was held on August 26, 2009.  (Tr. 3).  Plaintiff was present and was represented by counsel.  (Id.).  Ms. Young was also present.  (Id.).

The ALJ indicated that the hearing was being held pursuant to a request made by plaintiff's attorney.  (Id.).

Plaintiff's attorney examined Ms. Young.  (Tr. 4).  Plaintiff's attorney asked Ms. Young to review the physical medical source statement provided by Dr. Halstead.  (Id.).  Ms. Young testified that such an individual would be unable to perform plaintiff's past work.  (Tr. 5).  Ms. Young stated that the individual would be capable of performing sedentary jobs.  (Id.).  Ms. Young noted that the SSA and DOT limitations for sedentary work involve lifting a maximum of ten pounds but do not provide a minimum weight, and that there would be sedentary jobs that do not require lifting up to ten pounds.  (Tr. 6).

Plaintiff's attorney noted that Dr. Halstead found that plaintiff was capable of frequently lifting five pounds but not frequently carrying that object.  (Tr. 6).  Ms. Young testified that this limitation could possibly have significance.  (Id.).  Ms. Young stated that sedentary positions generally do not require carrying objects.  (Id.).  Ms. Young testified that such positions include sedentary cashier, such as parking lot cashier; sedentary small products assembly; and telemarketer.  (Tr. 6-7).  Ms. Young stated that these positions have a production expectation but do not require speed like an assembly line position.  (Tr. 7).

Ms. Young testified that the positions would probably not tolerate more than two absences a month.  (Id.).  Ms. Young stated that an employee who missed two days a month because of pain and another day a month due to a doctor's appointment would not be able to maintain a job over time.  (Tr. 8).  Ms. Young testified that the same would be true if the

- 13 -

employee only missed part of a day due to a scheduled doctor's appointment along with two unscheduled absences.  (Id.).

Ms. Young testified that the jobs she described usually provide a fifteen-minute break in the mid-morning and mid-afternoon, and a half-hour to hour lunch.  (Id.).  Ms. Young noted that most entry-level type of jobs provide only a half-hour lunch period.  (Id.).  Ms. Young testified that these breaks would be scheduled.  (Id.).  Ms. Young stated that, if an individual was required to take four or more breaks during the workday, it would eventually eliminate those jobs because they are entry level and do not provide as much leeway in terms of additional breaks.  (Id.).

Plaintiff's attorney then examined plaintiff, who testified that she took Simvastatin for cholesterol; Metformin for diabetes; aspirin for her heart; Labetalol, Lisinopril,[7] and Hydrochlorothiazide for hypertension; Etodolac and Tramadol for pain; and over-the-counter Aleve and ibuprofen.  (Tr. 9).  Plaintiff stated that the Lisinopril and Hydrochlorothiazide cause her to use the restroom frequently.  (Tr. 10).  Plaintiff testified that she occasionally has to urinate every ten minutes.  (Id.).  Plaintiff stated that she also has to urinate frequently when her sugar level is high.  (Tr. 11).  Plaintiff testified that her sugar level is elevated quite often.  (Id.).

Plaintiff stated that she has scheduled doctor's appointments two to three times a month.  (Id.).


C.    **Relevant Medical Records**

Plaintiff underwent x-rays of the lumbar spine on May 5, 2004, which revealed no abnormalities.  (Tr. 905).

---

[7]Lisinopril is indicated for the treatment of hypertension.  See PDR at 2088.

- 14 -

Plaintiff presented to Barnes-Jewish Hospital on July 29, 2005, with complaints of shortness of breath.  (Tr. 627).  Plaintiff was postpartum day six status post a normal spontaneous vaginal delivery that was complicated postpartum by poorly controlled blood pressure.  (Id.).  Plaintiff's blood pressure was 199/110.  (Id.).  Plaintiff was discharged on August 2, 2005.  (Id.).  Her discharge diagnoses were septic pelvic thrombophlebitis,[8] chronic hypertension complicated by postpartum preeclampsia,[9] anxiety, and social issues.  (Id.).

Plaintiff presented to Barnes-Jewish Hospital on February 21, 2008 to establish primary care. (Tr. 757-59).  Plaintiff had a history of high blood pressure as well as gestational diabetes.  (Id.). Plaintiff complained of shortness of breath for about two months and chronic back and knee pain for two to three years.  (Id.).  Plaintiff reported that her back and knee pain was exacerbated by walking and cleaning.  (Id.).  Plaintiff's weight was 340 pounds and her blood pressure was 170/96.  (Tr. 758).  Upon physical examination, Brian McNabb, M.D. noted mild point tenderness over the lumbar region.  (Tr. 758).  Dr. McNabb's assessment was hypertension, history of gestational diabetes mellitus,[10] and morbid obesity. (Tr. 758). Dr. McNabb prescribed Lisinopril and Hydrochlorothiazide and Labetalol for plaintiff's blood pressure, Metformin for suspected diabetes, and Tylenol for back and knee pain.  (Id.).  Dr. McNabb stated that plaintiff's shortness of breath was likely due to plaintiff's obesity and uncontrolled hypertension and diabetes mellitus.  (Id.).  He indicated that

_____

[8]Venous inflammation with clot formation.  See Stedman's Medical Dictionary, 1985 (28th Ed. 2006).

[9]Development of hypertension with proteinuria or edema, or both, due to pregnancy.  See Stedman's at 1553.

[10]Carbohydrate intolerance of variable severity with onset or first recognition during pregnancy.  See Stedman's at 528.

plaintiff's knee and back pain was osteoarthritis.[11]  (Id.).

On May 1, 2008, plaintiff presented to Mark Halstead, M.D., Clinical Instructor, Pediatric and Adult Nonoperative Sports Medicine, Washington University, for evaluation of bilateral knee pain over the last two years.  (Tr. 512-13).  Plaintiff reported that her knees bothered her with standing or sitting for a long time, and with transitioning from a seated to a standing position.  (Id.). It was noted that plaintiff had gained over 100 pounds over the last years due to her pregnancies.  (Tr. 512). Plaintiff weighed 330 pounds.  (Id.).  Upon examination, plaintiff was "well-appearing and in no distress."  (Id.).  Plaintiff had near full range of motion to both knees without pain; she had tenderness along the medial joint line bilaterally as well as mildly along the medial patellar facet.  (Id.).  Plaintiff underwent x-rays of the knees, which revealed severe bone on bone osteoarthritic changes of the medial compartment.  (Id.).  Dr. Halstead's impression was bilateral severe knee ostoarthritic changes, which bothered plaintiff more intermittently than it does consistently.  (Id.).  Dr. Halstead recommended a physical therapy program and ice at the end of the day.  (Id.).  He also provided plaintiff with a heel wedge.  (Id.).

Plaintiff presented to the emergency room at Barnes-Jewish Hospital on May 11, 2008, with flu-like symptoms for five days.  (Tr. 724-44).  Plaintiff was diagnosed with sinusitis and constipation and was discharged to home.  (Tr. 736).

On May 28, 2008, Dr. Halstead's office noted "script for cane mailed to pt's house per pt's request."  (Tr. 518).

--------

[11]Arthritis characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed, and thinned with eburnation of subchondral bone and outgrowths of marginal osteophytes; pain and loss of function result. Stedman's at 1388.

Dr. Halstead completed a statement at the request of the state agency, in which he indicated that plaintiff was diagnosed with bilateral knee bone on bone osteoarthritis. (Tr. 509). Dr. Halstead reported that plaintiff's knee range of motion was 0 to 130 degrees. (Id.). When asked to express his opinion regarding plaintiff' ability to perform work-related functions, Dr. Halstead stated that plaintiff had difficulty with prolonged standing or walking. (Id.).

Plaintiff saw Dr. McNabb for a follow-up on October 17, 2008, at which time she reported that her shortness of breath was much improved and that she was able to walk for longer distances without getting tired. (Tr. 718). Plaintiff indicated that her knee pain was exacerbated by walking. (Id.). Plaintiff reported that she experienced relief from Tylenol arthritis. (Id.). Plaintiff had lost thirty pounds since her last visit intentionally. (Id.). Plaintiff weighed 310 pounds and her blood pressure was 164/104. (Id.). Dr. McNabb's assessment was diabetes mellitus and hypertension. (Tr. 719). Plaintiff was encouraged to continue her exercise regiment and lose weight. (Id.).

Plaintiff saw Dr. McNabb on May 14, 2009, at which time she reported a lot of knee, feet, and back pain. (Tr. 707). Plaintiff indicated that she had been using a cane to walk. (Id.). Plaintiff had not been checking her blood sugars because she had lost her glucometer. (Id.). Plaintiff's weight was 324 and her blood pressure was 178/96. (Tr. 708). Plaintiff indicated that she wanted to stop the Lisinopril for teratogenic effects. (Id.). Plaintiff underwent x-rays of the lumbar spine, which revealed mild degenerative disc disease. (Tr. 710). Dr. McNabb increased plaintiff's Metformin, increased plaintiff's Labetalol, and started plaintiff on Tramodol for her back and knee pain. (Tr. 709).

Dr. Halstead completed a Physical Medical Source Statement on June 19, 2009. (Tr. 906-09). Dr. Halstead listed plaintiff's diagnosis as bilateral severe knee osteoarthritis. (Tr. 906). Dr. Halstead

expressed the opinion that, in an eight-hour workday, plaintiff could sit for eight hours, stand for thirty minutes, and walk for thirty minutes.  (Tr. 906).  Dr. Halstead found that plaintiff could frequently lift five pounds and occasionally lift ten pounds; and that plaintiff could occasionally carry five to ten pounds. (Tr. 907). He found that plaintiff could frequently reach above her head but only occasionally stoop. (Id.). Dr. Halstead noted that plaintiff experienced pain as a result of her bilateral knee osteoarthritis and that plaintiff had objective indications of pain of muscle atrophy and reduced range of motion. (Tr. 908).  Plaintiff's subjective indications of pain were listed as complaints of pain, sleeplessness, and grimaces. (Id.). Dr. Halstead indicated that plaintiff's pain would not preclude persisting or focusing on simple tasks on a sustained full-time work schedule, provided it was a sit-down job. (Id.). Dr. Halstead expressed the opinion that plaintiff would be absent from work due to her impairments twice a month and that plaintiff would be late due to her impairments once a month or less. (Id.). Dr. Halstead indicated that plaintiff did not require more than three breaks during a workday. (Tr. 909). Dr. Halstead stated that a cane or walker may help but would not eliminate plaintiff's pain. (Id.).

On August 25, 2009, Dr. McNabb completed a Physician's Statement for Disabled License Plates/Placard. (Tr. 910). Dr. McNabb indicated that plaintiff was unable to ambulate or walk fifty feet without stopping to rest due to a severe and disabling condition. (Id.).

**D.**     **Medical Records Submitted to Appeals Council**

Plaintiff saw Charles Mannis, M.D. for a consultative orthopedic evaluation on January 18, 2010. (Tr. 119-21). Plaintiff complained of knee pain and swelling. (Tr. 119). Plaintiff reported that she walked with a limp and had been using a cane for some time. (Id.). Plaintiff weighed 330

pounds. (Tr. 120). Upon examination, Dr. Mannis noted mild varus[12] alignment of both knees in the

standing position, and a very slight antalgic[13] gait, favoring the left leg. (Id.). Plaintiff used a cane

and was able to walk with less of a limp with the cane; without the cane plaintiff was able to walk

about twenty feet. (Id.). Plaintiff was unable to squat or walk on her heels and toes. (Id.). Plaintiff

was able to arise from the chair and examining table without assistance, dress and undress without

assistance, and tandem walk for a short period of time. (Id.). Dr. Mannis noted tenderness of both

knees to palpation. (Id.). Range of motion of both knees was symmetrical at 0 to 115 degrees,

consistent with plaintiff's body habitus. (Id.). Dr. Mannis' impression was degenerative arthritis of

both knees. (Id.).

Dr. Mannis completed a Medical Source Statement-Consultative Examination. (Tr. 110-12).

Dr. Mannis expressed the opinion that, during an eight-hour workday, plaintiff was capable of sitting

six hours, standing one hour, and walking one hour. (Tr. 110). Dr. Mannis found that plaintiff could

frequently lift and carry one to two pounds, and occasionally lift and carry five to ten pounds. (Id.).

He noted that plaintiff was limited in balancing, even when standing or walking on level terrain. (Tr.

111). Dr. Mannis indicated that an objective indication of plaintiff's pain was reduced range of

motion. (Id.). Dr. Mannis found that plaintiff's pain would not preclude persisting or focusing on

simple tasks on a sustained full-time work schedule. (Id.). Dr. Mannis indicated that plaintiff should

use a cane. (Id.). Dr. Mannis found that plaintiff's impairments cause the need to take more than

three breaks during a normal eight-hour workday because plaintiff should walk intermittently after

---

[12]A joint in an extremity that is deformed in such a way that the more distal of the two bones forming the joint deviates toward the midline, as in bowleg. Stedman's at 2091.

[13]A characteristic gait resulting from pain on weight-bearing in which the stance phase of gait is shortened on the affected side. Stedman's at 781.

sitting.  (Id.).  Finally, Dr. Mannis expressed the opinion that plaintiff's impairments would cause her

to miss work twice a month.  (Id.).

## The ALJ's Determination

The ALJ made the following findings:

1.    The claimant has not engaged in substantial gainful activity since October 19,
       2007, the filing date of the current application and the claimant's alleged onset
       date of disability

2.    The medical evidence establishes that the claimant has obesity, osteoarthritis of
       the knees, mild degenerative disc disease of the lumbosacral spine, and
       noninsulin-dependent diabetes mellitus, hypertension, and allergies controlled by
       medication, but no impairment or combination of impairments that meets or
       equals in severity the requirements of any impairment listed in Appendix 1,
       Subpart P, Regulations No. 4.

3.    The claimant's allegation of impairments, either singly or in combination,
       producing symptoms and limitations of sufficient severity to prevent the
       performance of any sustained work activity is not credible, for the reasons set out
       in the body of this decision.

4.    The claimant has the residual functional capacity to perform the physical
       exertional and nonexertional requirements of work except for prolonged or
       frequent standing or walking; lifting or carrying objects weighing more than 10
       pounds; climbing of ropes, ladders or scaffolds; doing more than occasional
       climbing of ramps and stairs or more than occasional balancing, stooping,
       kneeling, crouching, or crawling; or having concentrated or excessive exposure to
       unprotected heights or dangerous moving machinery or to dust, fumes, chemicals,
       temperature extremes, high humidity or dampness, and other typical allergens,
       pollutants, and atmospheric irritants.  There are no credible, medically-established
       mental or other nonexertional limitations (20 CFR 416.945).

5.    The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.    The claimant's residual functional capacity for the full range of sedentary work is
       reduced by the limitations described in Finding No. 4.

7.    The claimant is 41 years old, defined as a younger individual (20 CFR 416.963).

8.    The claimant has an eleventh grade limited education, but is literate and able to
       communicate in English (20 CFR 416.964).

9.      The claimant has no acquired or usable skills transferable to the skilled or semi-skilled functions of other work (20 CFR 416.968).

10.     Based on an exertional functional capacity for sedentary work, and the claimant's age, education, and work experience, 20 CFR 416.969 and Rule 201.25, Table No. 1, Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of "not disabled."

11.     Although the claimant's limitations do not allow the performance of the full range of sedentary work, there is, using the above-cited Rule as a framework for decision-making, a significant number of jobs in the local and national economies, which the claimant could perform.  Examples of such jobs are any of a total of about 15,500 sedentary jobs in the St. Louis Standard Metropolitan Statistical Area as a customer service representative, telemarketer, and small products assembler, according to vocational expert opinion.

12.     The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR 416.920(g)).

(Tr. 106-07).

The ALJ's final decision reads as follows:

It is the decision of the Administrative Law Judge that, based upon the application filed on October 19, 2007, the claimant is not eligible for supplemental security income under Sections 1602 and 1614(a)(3)(A) of the Social Security Act.

(Tr. 107).

## Discussion

### A.      Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v.

Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two

inconsistent positions from the evidence and one of those positions represents the Commissioner's

findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th

Cir. 1992).   The reviewing court, however, must consider both evidence that supports and

evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015,

1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court

must also take into consideration the weight of the evidence in the record and apply a balancing

test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The

analysis required has been described as a "searching inquiry."  Id.

**B.     The Determination of Disability**

        The Social Security Act defines disability as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or has lasted or can be expected to last for a continuous period of

not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant

has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d

598, 601 (8th Cir. 1997).

        The SSA Commissioner has established a five-step process for determining whether a

person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-

42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th

Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful

employment."  If the claimant is, disability benefits must be denied.  See 20 C.F.R. §§ 404.1520,

416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically

severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c)), 416.920 (c)).

To qualify as severe, the impairment must significantly limit the claimant's mental or physical

ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are

not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of

the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial

gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in

Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or

equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See

20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the

next step which inquires into whether the impairment prevents the claimant from performing his

or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform

the previous work, in consideration of the claimant's residual functional capacity (RFC) and the

physical and mental demands of the past work, the claimant is not disabled.  See id.  If the

claimant cannot perform his or her previous work, the final step involves a determination of

whether the claimant is able to perform other work in the national economy taking into

consideration the claimant's residual functional capacity, age, education and work experience.

See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if

s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains

upon the claimant until s/he adequately demonstrates an inability to perform previous work, at

which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform

other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments.  See 20 C.F.R. §§ 404.1520a (a), 416.920a (a).  A special procedure must be followed at each level of administrative review.  See id.  Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required.  See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e).  Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council.  See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.  See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace.  See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).  Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.  See id.  Next, the Commissioner must determine the severity of the impairment based on those ratings.  See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).

If the impairment is severe, the Commissioner must determine if it meets or equals a listed

mental disorder.  See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by

comparing the presence of medical findings and the rating of functional loss against the paragraph

A and B criteria of the Listing of the appropriate mental disorders.  See id.  If there is a severe

impairment but the impairment does not meet or equal the listings, then the Commissioner must

prepare a residual functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a

(c)(3).

**C.**    **Plaintiff's Claims**

  Plaintiff first argues that the ALJ erred in failing to properly weigh the opinions of

plaintiff's treating physicians.  Plaintiff next argues that the ALJ erred in determining plaintiff's

residual functional capacity.  Plaintiff finally argues that the ALJ's step five determination is not

supported by substantial evidence because the ALJ's residual functional capacity finding was more

restrictive than the ALJ's hypothetical to the vocational expert.  The undersigned will discuss

plaintiff's claims in turn.

**1.**    **Opinions of Treating Physicians**

  Plaintiff argues that, in determining plaintiff's residual functional capacity, the ALJ failed

to give the opinion of plaintiff's treating physicians controlling, or a least substantial, weight.  In

analyzing medical evidence, "[i]t is the ALJ's function to resolve conflicts among 'the various

treating and examining physicians.'"  Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001)

(quoting Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)).  "Ordinarily, a treating physician's

opinion should be given substantial weight."  Rhodes v. Apfel, 40 F. Supp.2d 1108, 1119 (E.D.

Mo. 1999) (quoting Metz v. Halala, 49 F.3d 374, 377 (8th Cir. 1995)).  Further, a treating

physician's opinion will typically be given controlling weight when the opinion is "well-supported

by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." Prosch v. Apfel, 201 F.3d 1010, 1012-1013 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527 (d)(2) (bracketed material in original).  Such opinions, however, do "not automatically control, since the record must be evaluated as a whole."  Id. at 1013 (quoting Bentley, 52 F.3d at 785-786).  Opinions of treating physicians may be discounted or disregarded where other "medical assessments 'are supported by better or more thorough medical evidence.'"  Id. (quoting Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997)).

Whatever weight the ALJ accords the treating physician's report, be it substantial or little, the ALJ is required to give good reasons for the particular weight given the report.  See Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001).  The ALJ, however, is not required to discuss every piece of evidence submitted.  See Morrison v. Apfel, 146 F.3d 625, 628 (8th Cir. 1998).  If the opinion of a treating physician is not well supported or is inconsistent with other evidence, the ALJ must consider: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed, (3) the degree to which the physician's opinion is supported by the relevant evidence, (4) consistency between the opinion and the record as a whole, (5) whether or not the physician is a specialist in the area upon which an opinion is rendered, and (6) other factors which may contradict or support the opinion.  See Rhodes, 40 F. Supp.2d at 1119; 20 C.F.R. § 404.1527 (d)(2)-(6).

Plaintiff first contends that the ALJ erred in failing to give controlling weight to the opinion of plaintiff's treating orthopedist, Dr. Halstead, particularly Dr. Halstead's opinions that plaintiff needed to use a cane or walker due to her impairments and that plaintiff would miss work

twice per month and be late up to once a month due to her impairments.

Dr. Halstead completed a Physical Medical Source Statement on June 19, 2009.  (Tr. 906-09).  Dr. Halstead listed plaintiff's diagnosis as bilateral severe knee osteoarthritis.  (Tr. 906).  Dr. Halstead expressed the opinion that, in an eight-hour workday, plaintiff could sit for eight hours, stand for thirty minutes, and walk for thirty minutes.  (Tr. 906).  Dr. Halstead found that plaintiff could frequently lift five pounds and occasionally lift ten pounds; and that plaintiff could occasionally carry five to ten pounds.  (Tr. 907).  He found that plaintiff could frequently reach above her head but only occasionally stoop.  (Id.).  Dr. Halstead noted that plaintiff experienced pain as a result of her bilateral knee osteoarthritis and that plaintiff had objective indications of pain of muscle atrophy and reduced range of motion.  (Tr. 908).  Dr. Halstead indicated that plaintiff's pain would not preclude persisting or focusing on simple tasks on a sustained full-time work schedule, provided it was a sit-down job.  (Id.).  Dr. Halstead expressed the opinion that plaintiff would be absent from work due to her impairments twice a month and that plaintiff would be late due to her impairments once a month or less.  (Id.).  Dr. Halstead indicated that plaintiff did not require more than three breaks during a workday.  (Tr. 909).  Dr. Halstead stated that a cane or walker may help but would not eliminate plaintiff's pain.  (Id.).

The ALJ discussed Dr. Halstead's treatment notes and opinions in detail.  The ALJ incorporated the majority of Dr. Halstead's findings in his residual functional capacity determination.  (Tr. 104).

With regard to Dr. Halstead's opinion that plaintiff needed to use a cane, the ALJ stated that the cane plaintiff occasionally uses was her idea rather than Dr. Halstead's.  (Id.).  The record reveals that, in May 2008, plaintiff requested a prescription for a cane and Dr. Halstead complied.

- 27 -

(Tr. 518).  At plaintiff's last office visit on May 1, 2008, Dr. Halstead diagnosed plaintiff with

bilateral severe knee osteoarthritic changes, but noted that it bothered her more intermittently than

consistently.  (Tr. 512).  Plaintiff had almost full range of motion to both knees without pain.

(Id.).  Dr. Halstead did not prescribe a cane at that time, but, rather prescribed physical therapy.

(Id.).  The ALJ was entitled to assign less weight to Dr. Halstead's opinion that plaintiff required

a cane when it appeared to be based on plaintiff's request rather than Dr. Halstead's medical

opinion.  See Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007).  Further, plaintiff testified at the

administrative hearing that she uses the cane when she has to climb steps or when she has to do

extensive walking.  (Tr. 55).  Plaintiff stated that she only occasionally uses her cane when she is

in an office-type environment.  (Id.).  As such, the ALJ's decision to discredit Dr. Halstead's

finding that plaintiff required a cane was supported by substantial evidence.

Plaintiff also contends that the ALJ erred in failing to give controlling weight to the

opinion of Dr. Halstead that plaintiff would miss work twice a month and be late up to once a

month due to her impairments.  The ALJ stated that he was not accepting Dr. Halstead's opinion

that plaintiff would miss work two to three days a month, noting that it seemed like a "dartboard

guess," and that nothing in the medical records confirms that frequency of absence or the

necessity for it.  (Tr. 105).  The ALJ pointed out that plaintiff actually had very infrequent medical

attention since May 2008, and that there is no evidence that she saw Dr. Halstead since then.

(Id.).  Finally, the ALJ noted that Dr. Halstead found that plaintiff should be comfortable enough

if she sits most of the time and that the jobs identified by the vocational expert would permit that.

(Id.).

As the ALJ noted, it is significant that plaintiff received little medical treatment despite her

- 28 -

complaints of disabling pain.  Plaintiff saw Dr. Halstead on May 1, 2008, for evaluation of her

knee pain.  (Tr. 512-13).  Dr. Halstead diagnosed plaintiff with severe knee osteoarthritic

changes, which bothered plaintiff intermittently.  (Tr. 512).  As previously noted, Dr. Halstead

mailed plaintiff a prescription for a cane, at plaintiff's request, on May 28, 2008.  (Tr. 518).

There is no indication in the record that plaintiff saw Dr. Halstead again before he completed his

medical source statement on June 19, 2009.

The record indicates that plaintiff saw Dr. McNabb on only two occasions during this time

period: On October 17, 2008, and on May 14, 2009.  (Tr. 718, 707).  On October 17, 2008,

plaintiff reported that her shortness of breath was much improved and that she was able to walk

for longer distances without getting tired.  (Tr. 718).  Plaintiff complained of exacerbated knee

pain with walking, but noted that she experienced relief from Tylenol arthritis.  (Id.).  Dr.

McNabb encouraged plaintiff to continue her exercise regiment and lose weight.  (Id.).  On May

14, 2009, plaintiff reported knee, feet, and back pain.  (Tr. 707).  Plaintiff underwent x-rays of the

lumbar spine, which revealed mild degenerative disc disease.  (Tr. 710).  Dr. McNabb prescribed

Tramodol for plaintiff's back and knee pain.  (Tr. 709).

The undersigned finds that the ALJ articulated sufficient reasons for rejecting Dr.

Halstead's opinion that plaintiff's impairments required her to miss work twice a month and be

late up to once a month.  The record supports the ALJ's finding that plaintiff did not seek

treatment often for her impairments.  The ALJ was entitled to discredit those opinions that were

not supported by the record.

The undersigned notes that plaintiff cites to the opinion of consultative physician Charles

Mannis as supportive of Dr. Halstead's opinion.  Dr. Mannis examined plaintiff on January 18,

- 29 -

2010, after the ALJ's decision, and completed a medical source statement.  (Tr. 113-21).  Plaintiff submitted Dr. Mannis' records to the Appeals Council.

The regulations provide that the Appeals Council must evaluate the entire record, including any new and material evidence that relates to the period before the date of the ALJ's decision.  See 20 C.F.R. § 404.970(b).  If the Appeals Council finds that the ALJ's actions, findings, or conclusions are contrary to the weight of the evidence, including the new evidence, it will review the case.  See 20 C.F.R. § 404.970(b).  Here, the Appeals Council denied review, finding that the new evidence was either not material or did not detract from the ALJ's conclusion.  In these circumstances, this court does not review the Appeals Council's denial but determines whether the record as a whole, including the new evidence, supports the ALJ's determination.  Cunningham v. Apfel, 222 F.3d 496, 500 (8th Cir. 2000).

In this case, the new evidence is not material and does not detract from the ALJ's conclusion.  Dr. Mannis found similar limitations as those found by Dr. Halstead, including the limitation that plaintiff would miss work twice a month due to her impairments.  (Tr. 111).  Dr. Mannis did not indicate that his opinion related to the time period in question.  In addition, Dr. Mannis did not provide any support for his opinion that plaintiff would require two absences a month due to her impairment.  There is no indication in the record that plaintiff sought frequent medical attention after Dr. Halstead rendered his opinion.  As such, the ALJ's decision to omit this limitation found by Dr. Halstead is supported by substantial evidence.

Plaintiff next contends that the ALJ erred in failing to give controlling weight to the opinion of Dr. McNabb, plaintiff's treating primary care physician, that plaintiff could not ambulate fifty feet without stopping to rest due to her condition.  The opinion of Dr. McNabb to

which plaintiff refers is contained in a physician statement for disabled license plates completed on August 25, 2009.  (Tr. 910).  Dr. McNabb simply checked a box next to the statement "[t]he person cannot ambulate or walk 50 feet without stopping to rest due to a severe and disabling arthritic, neurological, orthopedic condition, or other severe and disabling condition."  (Id.).  Dr. McNabb also checked a box indicating that plaintiff's disability was permanent.  (Id.).  No other information was provided by Dr. McNabb.

The ALJ cited Dr. McNabb's opinion and stated that is was entitled to "some weight" under the Commissioner's regulations.  (Tr. 104).  The ALJ noted that it did not, however, prove disability in this case, as a finding of disability by other governmental agencies is not binding upon the SSA.  (Id.).

The ALJ did not err in evaluating Dr. McNabb's opinion.  The ALJ assigned some weight to Dr. McNabb's opinion in determining that plaintiff was capable of performing only a limited range of sedentary work.  The ALJ properly pointed out that a finding of "permanent disability" by a state agency for purposes of disabled license plates was not binding on the Commissioner in this action.  See 20 C.F.R. § 416.904; Fisher v. Shalala, 41 F.3d 1261, 1262 (8th Cir. 1994).

Thus, the ALJ properly evaluated the opinions of plaintiff's treating physicians.


**2.      Residual Functional Capacity**

Plaintiff next argues that the ALJ erred in assessing plaintiff's residual functional capacity.

The ALJ made the following determination regarding plaintiff's residual functional capacity:

> The claimant has the residual functional capacity to perform the physical exertional and nonexertional requirements of work except for prolonged or frequent standing or walking;

lifting or carrying objects weighing more than 10 pounds; climbing of ropes, ladders or scaffolds; doing more than occasional climbing of ramps and stairs or more than occasional balancing, stooping, kneeling, crouching, or crawling; or having concentrated or excessive exposure to unprotected heights or dangerous moving machinery or to dust, fumes, chemicals, temperature extremes, high humidity or dampness, and other typical allergens, pollutants, and atmospheric irritants. There are not credible, medically-established mental or other nonexertional limitations (20 CFR 416.945).

(Tr. 106).

The undersigned finds that the ALJ's residual functional capacity determination is supported by substantial evidence. Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence. See Lauer, 245 F.3d at 704.

In this case, the residual functional capacity formulated by the ALJ is supported by the evidence. As discussed above, the ALJ adopted many of Dr. Halstead's findings in his residual functional capacity determination. Dr. Halstead indicated in a statement he completed for the state agency that plaintiff had difficulty with "prolonged standing or walking." (Tr. 509). The ALJ adopted this finding in his residual functional capacity determination. In his Physical Medical

Source Statement, Dr. Halstead found that plaintiff was capable of sitting for eight hours, standing for thirty minutes, and walking for thirty minutes; frequently lifting five pounds and occasionally lifting ten pounds.  (Tr. 907).  This is consistent with the performance of a limited range of sedentary work.

Plaintiff argues that the ALJ failed to include in his residual functional capacity assessment plaintiff's need to miss two or more days of work per month and plaintiff's need to take more than three breaks per workday due to a frequent need to use the restroom.  "Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner."  Cox. v. Astrue, 495 F.3d 614, 620 (8th Cir. 2007).  The ALJ declined to adopt the limitation found by Dr. Halstead that plaintiff require two absences a month due to her impairments.  The undersigned has already found that substantial evidence supports this decision.

With regard to plaintiff's need for more than three restroom breaks a day, plaintiff testified that a prescribed diuretic she was taking for hypertension caused her to urinate frequently.  (Tr. 10).  Plaintiff indicated that she also has to urinate frequently when her blood sugar levels are high.  (Id.).  The ALJ found that there was no documented evidence of the frequent or uncontrollable urinary incontinence plaintiff alleged at the hearings.  (Tr. 104).  The ALJ stated that, while this undoubtedly occurs at times, it would not prevent plaintiff from maintaining a normal work schedule.  (Id.).

The ALJ provided sufficient reasons for not including a limitation of more than three restroom breaks a day.  "A disability claimant has the burden to establish her RFC."  Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005).  As the ALJ pointed out, there is no evidence in the

medical record that plaintiff complained of frequent urination or urinary incontinence.  None of plaintiff's physicians found that plaintiff required more than three restroom breaks in a workday.  As such, the ALJ was entitled to omit this limitation from his residual functional capacity.

Finally, plaintiff argues that the ALJ did not properly consider the effects of plaintiff's condition of "extreme obesity."  Plaintiff correctly notes that her BMI of 56.7[14] is considered Level III extreme obesity under the guidelines of the National Institutes of Health.  See Titles II and XVI: Evaluation of Obesity, S.S.R. 02-01p, 2000 WL 628049, * 2 (Sept. 12, 2002).  When considering a claimant's obesity, an ALJ is to consider whether it is a "severe" impairment.  Id. at * 4.  It is such an impairment "when, alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activity."  Id.  "There is no specific level of weight or BMI that equates with a 'severe' or a 'not severe' impairment," nor does the descriptive term, e.g., "extreme," establish whether the obesity is severe.  Id.

In this case, the ALJ acknowledged that plaintiff's weight at all relevant times exceeded the regulatory definition of obesity.  (Tr. 102).  The ALJ fund that there was no credible evidence that plaintiff's obesity, although contributing to some diminution in ordinary mobility and stamina, reduced plaintiff's overall functional abilities, either by itself or in combination with other medically-established impairments, any further than the residual functional capacity determined by the ALJ.

The ALJ properly considered plaintiff's obesity pursuant to the Commissioner's

---

[14]Based upon plaintiff's height of 5'2" and weight of 310, her lowest weight since her alleged onset date.

regulations.  He was not required to differentiate between obesity and "extreme obesity."  The

ALJ considered plaintiff's obesity in finding plaintiff was capable of performing only a limited

range of sedentary work.  Thus, the ALJ's residual functional capacity determination is supported

by substantial evidence in the record.

**3.     Vocational Expert Testimony**

Plaintiff contends that the ALJ's step five determination is not supported by substantial

evidence because the ALJ's residual functional capacity finding was more restrictive than the

ALJ's hypothetical to the vocational expert.

Testimony from a vocational expert based on a properly phrased hypothetical question

constitutes substantial evidence upon which to base an award or denial of Social Security benefits.

See Howard v. Massanari, 255 F.3d 577, 582 (8th Cir. 2001).  In order to constitute substantial

evidence upon which to base a denial of benefits, the testimony of a vocational expert must be in

response to a hypothetical question which "captures the concrete consequences of the claimant's

deficiencies."  Robson v. Astrue, 526 F.3d 389, 392 (8th Cir. 2008).  See also Swope v. Barnhart,

436 F.3d 1023, 1025 (8th Cir. 2006).  "If a hypothetical question does not include all of the

claimant's impairments, limitations, and restrictions, or is otherwise inadequate, a vocational

expert's response cannot constitute substantial evidence to support a conclusion of no disability."

Cox v. Apfel, 160 F.3d 1203, 1207 (8th Cir. 1998).

The ALJ set out the following limitations in his hypothetical to vocational expert Brenda

Young:  capable of lifting carrying, pushing, and pulling ten pounds occasionally and frequently;

capable of sitting for six out of eight hours; standing and walking for two out of eight hours for a

total of eight out of eight hours; capable of occasional climbing, stooping, crouching, kneeling and

crawling; no exposure to ladders, ropes, scaffolds or unprotected heights; and no concentrated

exposure to dust, fumes, gases, and chemicals.  (Tr. 62).  Ms. Young testified that these

restrictions would eliminate plaintiff's past work.  (Id.).  Ms. Young stated that the individual

could perform other sedentary jobs such as a customer service representative, telemarketer, and

small product assembly.  (Tr. 62-63).

Plaintiff notes that, in his decision, the ALJ found that plaintiff was not capable of

engaging in "prolonged or frequent standing or walking."  (Tr. 106).  Plaintiff argues that this

limitation is more restrictive than the limitation of standing and walking two out of eight hours

that he included in the hypothetical posed to Ms. Young.  Plaintiff contends that, because Ms.

Young's testimony was based on a less restrictive residual functional capacity finding, the ALJ's

step five determination was not based on substantial evidence.

In his decision, the ALJ was clear that he was restricting plaintiff to sedentary work.  The

ALJ stated as follows in the body of his decision: "Although the undersigned finds that the

claimant cannot perform past relevant work, he finds no persuasive medical reason why the

claimant could not perform sedentary work.."  (Tr. 104).  The ALJ continued: "Jobs are sedentary

if walking and standing are required only occasionally and all other sedentary criteria are met.  20

CFR 416.967(a)."  (Id.)  The regulations define "occasionally" as "occurring from very little up to

one-third of the time."  SSR 83-10.  "Since being on one's feet is required 'occasionally' at the

sedentary level of exertion, periods of standing or walking should generally total no more than

about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of

an 8-hour workday."  SSR 83-10.  The Eighth Circuit has held that a limitation of no prolonged

standing or walking is consistent with the performance of sedentary work.  See Shannon v.

- 36 -

Chater, 54 F.3d 484, 487 (8th Cir. 1995).

The ALJ's residual functional capacity finding that plaintiff was unable to engage in prolonged walking and standing is consistent with the limitations set forth in the hypothetical posed to the vocational expert.  As such, the vocational expert's testimony constitutes substantial evidence upon which to deny plaintiff's claim for benefits.

## Conclusion

Substantial evidence in the record as a whole supports the decision of the ALJ finding plaintiff not disabled because the evidence of record does not support the presence of a disabling impairment.  Accordingly, Judgment will be entered separately in favor of defendant in accordance with this Memorandum.

Dated this _26th_ day of September, 2011.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE

- 37 -